JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Jermaine Stewart ("defendant"), appeals his felonious assault conviction. After reviewing the facts of the case and pertinent law, we affirm.
 {¶ 2} On the evening of July 21, 2006, defendant, his cousin Edward Addison (" Addison"), and Christopher Walton ("Walton") drove by a group of men who were standing on Raymont Boulevard in University Heights, Ohio. Walton was driving a two-door Chevrolet Monte Carlo, defendant was sitting in the front passenger seat, and Addison was in the back seat. Walton stopped the car briefly and asked the group of men if they knew where he could find Demario Camper ("Camper"). One of the men answered that Camper was not with them. Walton drove a little further down the street and stopped his vehicle again. Addison got out of the car from the passenger side and shot a gun three times in the air. Addison then got back into the vehicle, and Walton drove away. One of the stray bullets hit Aarius Waters in the buttocks.
 {¶ 3} Over a year later, on September 5, 2007, defendant was indicted on two counts of felonious assault with firearm specifications. On December 21, 2007, a jury found him guilty, under a complicity theory, of one count of felonious assault in violation of R.C. 2903.11(A)(1). He was found not guilty of the remaining assault charge and all firearm specifications. The court sentenced him to 120 days in county jail and five years of community control sanctions. *Page 4 
 {¶ 4} Further details of the events of July 21, 2006 will be discussed as needed in the analysis of defendant's two assignments of error.
 {¶ 5} "I. There was insufficient evidence to convict Mr. Stewart of felonious assault."
 {¶ 6} When reviewing sufficiency of the evidence, an appellate court must determine "[w]hether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt" State v. Jenks (1991), 61 Ohio St.3d 259.
 {¶ 7} R.C. 2903.11 governs felonious assault and section(A)(1) of that statute states that "[n]o person shall knowingly *** [c]ause serious physical harm to another ***." Furthermore, to convict an offender as an accomplice, the state must prove that he or she, "acting with the kind of culpability required for the commission of an offense, ***" aided or abetted the principal offender. R.C. 2923.03(A)(2). "A person aids and abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime, and shares the criminal intent of the principal. State v. Johnson (2001),93 Ohio St.3d 240, 245-246. Such intent may be inferred from the circumstances surrounding the crime. Id." State v. Gibbs, Cuyahoga App. No. 86126, 2006-Ohio-175. *Page 5 
 {¶ 8} In the instant case, a witness who was part of the group of men standing on Raymont Boulevard testified that he approached Walton's car from the passenger side to speak to Walton, who was the driver. The witness identified defendant as the person sitting in the front passenger seat of the vehicle, with his hand under his shirt as if he was holding something such as a gun or a knife. After a brief conversation, Walton began to drive the car away, then stopped and pulled over a few houses up the street. The witness saw "two people get out the car and look like they was exchanging something. And then say about a second later three gunshots." The witness identified defendant and Addison as the people who got out of the passenger side of the car.
 {¶ 9} Addison, the back seat passenger in the vehicle, testified that as he, Walton, and the defendant were driving toward University Heights, defendant showed him a gun. When Walton stopped the car a few houses down from where the group of men were standing on Raymont Boulevard, defendant pulled the back of his seat forward to let Addison out of the car, gave him the gun, held the seat forward while Addison shot the gun three times and jumped back in the car, and then took the gun back from Addison as they drove away from the scene. Asked if defendant saw him fire the gun, Addison replied, "He had to because the door was open." Asked whose plan it was to "jump into the car and fire the shots at the group," Addison answered that it was Walton's and defendant's, although *Page 6 
he testified that defendant never specifically told him to shoot the gun. Additionally, Addison gave the following testimony:
 {¶ 10} "Q: *** How far away from the car would you say you stepped before you fired your shots?
 {¶ 11} "A: *** [A]ll I did was put one foot out, I jumped out, jump back in.
 {¶ 12} "Q: Okay. So who let you back inside the car?
 {¶ 13} "A: Jermaine Stewart. He kept the seat, kept the seat forward.
 {¶ 14} "Q: You think both people inside the car would be able to tell that the shots were coming from your car and not from the group of kids?
 {¶ 15} "A: Yeah.
 {¶ 16} "Q: And this car waited for you while you were firing the shots?
 {¶ 17} "A: Yes.
 {¶ 18} "***
 {¶ 19} "Q: So when you got out of the car, are you positive that the defendant is the one who gave you the gun?
 {¶ 20} "A: Yes.
 {¶ 21} "Q: Are you positive he saw you fire that gun?
 {¶ 22} "A: Yes.
 {¶ 23} "Q: And he still took this gun back?
 {¶ 24} "A: Yes. *Page 7 
 {¶ 25} "Q: In your opinion, if you know, do you think that defendant knew that you were going [to] fire a gun after he let you out of the car, gave you a loaded pistol?
 {¶ 26} "A: He knew I wasn't going to throw it at nobody or nothing.
 {¶ 27} "Q: After you fired this weapon the defendant lets you back into the car?
 {¶ 28} "A: Yes.
 {¶ 29} "Q: And the defendant took his gun back?
 {¶ 30} "A: Yes.
 {¶ 31} "Q: And Chris Walton drove you guys off?
 {¶ 32} "A: Yes."
 {¶ 33} In reviewing this evidence in a light most favorable to the state, as we must, a trier of fact could have found that defendant aided or abetted Addison in the felonious assault of shooting the victim. It can be inferred from the circumstances that defendant supported, assisted and/or cooperated with Addison, who fired the gun. Furthermore, this court has held that "[s]hooting a gun in a place where there is a risk of injury to a person can support a finding that a person acted `knowingly' for purposes of felonious assault." State v. Johnson, Cuyahoga App. No. 85862, 2005-Ohio-5852. Defendant's first assignment of error is overruled. *Page 8 
 {¶ 34} "II. The conviction of appellant was against the manifest weight of the evidence."
 {¶ 35} The proper test for an appellate court reviewing a manifest weight of the evidence claim is as follows: "The appellate court sits as the `thirteenth juror' and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 36} In the instant case, Walton's and defendant's testimony revealed a slightly different version of the events of July 21, 2006 than the state's witnesses presented. Walton testified that he, defendant, and Addison drove to the Raymont Boulevard area to talk to Camper about a recent situation the two had involving a woman. Walton stated that "if anything went down and they tried to jump me or anything [defendant and Addison were] there to help them off me. Because it was never no intent to shoot anybody or do anything. It was just come talk man to man to find out what went on."
 {¶ 37} Walton further testified that he never saw defendant with a gun in his car or at any other time that night. According to Walton, he had no idea that Addison fired a gun that night. Walton testified that he pulled his car over shortly after speaking with the group of men because Addison asked him to. *Page 9 
Then Addison got out of the car for a moment and got back in. Although Walton admits to hearing gunshots, he thought the group of men standing on Raymont Boulevard must have fired a gun. Walton stated that he did not know anyone was shot until the police contacted him subsequent to the incident.
 {¶ 38} According to defendant, on the other hand, he, Walton, and Addison were driving around, and he had no idea that Walton was headed toward University Heights to talk to Camper. Defendant testified that after Walton stopped on Raymont Boulevard to ask the group of men about Camper, Walton started to drive away when Addison asked to get out of the car. Defendant pulled his seat forward, Addison got out of the car, then defendant heard gunshots. Defendant said he had no idea who was shooting and that he never had, or even saw, a gun that night. Defendant further stated that he did not know anyone had been shot until five or six months later when detectives questioned him about the incident.
 {¶ 39} According to defendant, who was friends with Walton at the time of the incident, he has not had contact with Walton since the incident and never questioned why Walton was not around anymore:
 {¶ 40} "Q: You said you stopped seeing Chris afterwards because you didn't want to have anything to do with that incident?
 {¶ 41} "A: That's right. *Page 10 
 {¶ 42} "Q: But you said you didn't know anybody got shot for another five, six months?
 {¶ 43} "A: But I knew what had occurred that night.
 {¶ 44} "Q: So you said you used to hang out late with Chris [Walton] almost all the time, right?
 {¶ 45} "A: All the time.
 {¶ 46} "Q: Did you not wonder why you hadn't seen your buddy Chris for five months? I mean, after this night when there is a shooting did it ever occur to you, hey, man, where has Chris been?
 {¶ 47} "A: No. I knew the reason.
 {¶ 48} "Q: So you did know?
 {¶ 49} "A: The reason was because I chose not to talk to him.
 {¶ 50} "Q: No. No. No. I am asking you, for five months you said you didn't know someone got shot, but your good buddy that you hang out with all the time was sitting in County Jail.
 {¶ 51} "A: I wasn't aware of that.
 {¶ 52} "Q: You mean you didn't ask anybody where has Chris been?
 {¶ 53} "A: Not at all.
 {¶ 54} "Q: You weren't concerned about him?
 {¶ 55} "A: Not at all.
 {¶ 56} "*** *Page 11 
 {¶ 57} "Q: That's your good friend?
 {¶ 58} "A: That's my best friend.
 {¶ 59} "***
 {¶ 60} "Q: You never called Chris' family to ask him where he was?
 {¶ 61} "A: His family grew up with my family, so we stayed in touch. I seen his family almost every day.
 {¶ 62} "Q: Did you know that he was under arrest for felonious assault?
 {¶ 63} "A: No, I did not.
 {¶ 64} "Q: They never told you that?
 {¶ 65} "A: No.
 {¶ 66} "Q: They never said — you never said hey, I was with Chris this night and now he is under arrest, where is he?
 {¶ 67} "A: No.
 {¶ 68} "Q: No one mentioned the fact that your best buddy was in jail?
 {¶ 69} "A: No, they didn't.
 {¶ 70} "Q: And you never felt the need to come forward and say Chris didn't have anything to do with it, neither did I, we didn't know what happened?
 {¶ 71} "A: No, I didn't."
 {¶ 72} In State v. Burten, Cuyahoga App. No. 88395, 2007-Ohio-2641, this court held that a "jury may take note of any inconsistencies in testimony and resolve them accordingly, believing all, part, or none of a witness's testimony." *Page 12 
The jury in the instant case placed more weight on the testimony of Addison and the eye-witness than it did on the defense's case. Furthermore, there were inconsistencies between Walton's and defendant's testimony.
 {¶ 73} The jury did not lose its way when it chose not to believe defendant's testimony that he did not know a gun had been fired less than three feet from where he was sitting and that he did not know his "best friend" was in jail on felonious assault charges for five months following this incident. Nothing in the record shows that a manifest injustice occurred, and defendant's second assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and *Page 13 
MARY JANE BOYLE, J., CONCUR *Page 1